IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| IN THE MATTER OF THE SEARCH OF:<br>The premises known as the offices of<br>Google Inc., 1600 Amphitheatre<br>Parkway, Mountain View, CA 94043<br>Account: **ctdemure@gmail.com** | Case No. 3:18-mj-00223-DMS<br><br>**Filed Under Seal** |
| --- | --- |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Tyler Vose, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for

information associated with a certain accounts that is stored at premises controlled by

Google, Inc. ("Google"), an email provider headquartered at 1600 Amphitheatre

Parkway, Mountain View, California. The information to be searched is described in the

following paragraphs and in Attachment A. This affidavit is made in support of an

application for a search warrant under 18 U.S.C. § 2703(a), 2703(b)(1)(A) and

2703(c)(1)(A), and pursuant to, and Federal Rule of Criminal Procedure 41, to require

Google to disclose to the government copies of the information (including the content of

communications) further described in Section I of Attachment B. Upon receipt of the

information described in Section I of Attachment B, government-authorized persons will

review that information to locate the items described in Section II of Attachment B.

2.      I am an investigative or law enforcement officer of the United States,

within the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct



APR 1 1 2018

investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I have

been a Special Agent with the Federal Bureau of Investigations (FBI) since May 2011.

Since that time I have been assigned investigative responsibilities in the areas of public

corruption in the Detroit and San Juan Field Offices, Indian country matters on the Pine

Ridge Indian Reservation in South Dakota, and public corruption violations in the

Anchorage Field Office, where I am currently assigned. The Anchorage Field Office is

located within the District of Alaska. Prior to being an FBI Special Agent, I served as a

Human Intelligence Collector with the United States Army 5 years and 7 months. In

addition to traditional combat duties, I conducted military source operations and

interrogations on suspected members of Al-Qa'ida and other radical Islamic

terrorist/insurgent groups in Iraq.

3.       The information set forth below is based upon my knowledge of an

investigation conducted by the FBI and other law enforcement agents and officers. I

have not included each and every fact obtained pursuant to this investigation, and instead

have only included facts sufficient to establish probable cause for the requested search

warrant to issue.

4.       I make this affidavit in support of an application for a search warrant

regarding the email account of Christopher James DeMure (hereinafter "Chris DeMure")

and Tina Marie DeMure (hereinafter "Tina DeMure") (collectively "the DeMures") – that

is, **ctdemure@gmail.com** – from the date that account was created continuing through

the date of the requested warrant is signed, as further set forth in Attachments A and B,

which are fully incorporated herein by reference.

APR 1 1 2018

5.　　The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, various documents, database records, and other information. This affidavit does not set forth all of my knowledge about this matter, but rather is drafted for the purpose of establishing probable cause for the requested warrant to issue.

6.　　Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1341 (Mail Fraud) and 18 U.S.C. § 1343 (Wire Fraud) (hereinafter the SUBJECT OFFENSES) have been committed by Chris DeMure and Tina DeMure. There is also probable cause to search **ctdemure@gmail.com**, further described in Attachment A, for evidence and instrumentalities of these crimes further described in Attachment B.

## JURISDICTION

7.　　This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *See* 18 U.S.C. § 2703(a), (b)(1)(A), (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## SUBJECT ACCOUNT

8.　　Account information provided by Google, Inc. indicated that Chris and Tina DeMure were co-subscribers to **ctdemure@gmail.com.** The DeMures created **ctdemure@gmail.com** on September 8, 2008, and listed a secondary e-mail address as tinademure@yahoo.com and a cellular telephone number of 910-578-8785. According

APR 1 1 2018

to AT&T, this cellular telephone number was subscribed to by Chris DeMure on November 20, 2005, and remains in service.

9.      On January 8, 2018, a preservation letter was sent to Google to preserve all electronic communications regarding **ctdemure@gmail.com**. In general, an email that is sent to a Google email subscriber is stored in the subscriber's "mail box" on Google servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on Google servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Google's servers for up to ten days.

## DEFINITIONS AND INFORMATION PERTINENT TO GOOGLE AND THE SUBJECT EMAIL ACCOUNT

10.      Based on my training and experience and investigation in this case, I have learned the following about Google:

a.      Google offers an e-mail service that is available free to Internet users called "Gmail." Stored electronic communications, including opened and unopened e-mails, for Gmail subscribers may be located on Google's computers.

b.      Google maintains electronic records pertaining to the individuals and companies for which they maintain subscriber accounts. These records include account access information, e-mail transaction information, and account application information. In my training and experience, such information related to **ctdemure@gmail.com** may constitute evidence of the SUBJECT OFFENSES. Among other things, the information can be used to identify each account's user or users over time, including at a particular time.

APR 1 1 2018

      c.     Subscribers can access their Gmail e-mail accounts by activating software on a device or computer1, login in using unique usernames and passwords, and connecting to high-speed Internet computers called "servers" maintained and/or owned by Google. Subscribers also may be able to access their accounts from any other computer in the world through Google's web site on the Internet.

      d.     When a user sends any e-mail to a Gmail e-mail subscriber the email is stored in the subscriber's "mail box" on Google's servers until the subscriber deletes it or until the stored e-mail exceeds the storage limit allowed by Google.

      e.     When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to Google's servers, and then transmitted to its end destination, usually through another subscriber's e-mail provider. Copies of sent e-mail are stored on Google's servers in the same manner as received e-mail, Google retains the email until the user deletes it or exceeds the storage limit.

      f.     Even if the contents of the message no longer exist on the company's servers, Google may have records of when a subscriber logged into his or her account, when a message was sent or received, as well as technical routing information that law enforcement could use to determine who sent or received an e-mail.

---

1 "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices. See 18 U.S.C. § 1030(e)(1).

APR 1 1 2018

g.     A Google email subscriber can also store other files with Google in addition to emails, including address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files on servers maintained and/or owned by Google. In my training and experience, evidence of, among other things, who was using an email account may be found in address books, contact or buddy lists, calendars, emails in the account, and attachments to emails, including pictures and files.

11.     From my training and experience, I am aware that Google's computers contain information and other stored electronic communications belonging to unrelated third parties. Accordingly, this affidavit and application for search warrant seeks authorization solely to search the Gmail account and/or files for information and the content of communications pertaining to **ctdemure@gmail.com** fully identified in Attachment A, for the information set forth in Attachment B, following the procedures described herein.

12.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or

APR 1 1 2018

controlled the account at a relevant time. Further, information maintained by the email

provider can show how and when the account was accessed or used. For example, email

providers typically log the IP addresses from which users access the email account, along

with the time and date of that access. By determining the physical location associated

with the logged IP addresses, investigators can understand the chronological and

geographic context of the email account access and use relating to the crime under

investigation. This geographic and timeline information may tend to either inculpate or

exculpate the account owner. Additionally, information stored at the user's account may

further indicate the geographic location of the account user at a particular time (*e.g.*,

location information integrated into an image or video sent via email). Lastly, stored

electronic data may provide relevant insight into the email account owner's state of mind

as it relates to the offenses under investigation. For example, information in the email

account may indicate the account owner's motive and intent to commit a particular crime

(*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting

communications in an effort to conceal them from law enforcement).

## BACKGROUND ON FRAUD AND FINANCIAL CRIMES AND THE USE OF TECHNOLOGY IN FURTHERANCE OF SUCH CRIMES

13.     As a result of my training and experience, I am familiar with how various

financial crimes are committed. Based upon my training and experience, as well as the

knowledge and experience of other agents and police officers in my office, I am aware

that it is a common practice for individuals involved in financial crimes, including the

SUBJECT OFFENSES, to utilize computer systems, including email accounts, to

APR 1 1 2018

maintain correspondence with victims, coconspirators, others involved in their schemes to defraud, and/or financial institutions to carry out, facilitate, and/or perpetuate their schemes. Furthermore, such computer systems are frequently instrumentalities of such crimes and often contain evidence of that conduct.

14.     In my training and experience, it is common practice for individuals involved with financial fraud to utilize email accounts to facilitate, among other things, online purchases using credit cards and other means of payment, and other forms of money movement to further their illicit transactions. Evidence of these financial transactions and records relating to income and expenditures of money in connection with the fraudulently acquired funds are also typically maintained upon such email accounts. Additionally, email accounts are frequently used to communicate about the related criminal activity and maintain receipts and records.

15.     My awareness of these criminal practices, as well as my knowledge of the SUBJECT OFFENSES, as set forth in this affidavit, arise from the following: (a) my own involvement in prior criminal financial investigations and computer searches during my career as a law enforcement officer, as previously described; (b) information provided by other agents and police officers regarding interviews and other information from their own financial investigations; and (c) other intelligence information provided through law enforcement channels.

//

//



APR 1 1 2018

## DEFINITIONS AND INFORMATION PERTINENT TO
## CERTAIN INSURANCE CLAIMS

16.     The following definitions that pertain to the United States Automobile Association Federal Savings Bank ("USAA") and/or the American Express ("AMEX") insurance policies held by the DeMures, which are relevant to this affidavit, apply to this Affidavit and Attachments A and B:

a.     "Homeowner's Insurance" is an insurance policy that covers losses and damages to an individual's house and to assets inside the home.

b.     "Purchase Protection Benefit" is associated with AMEX's purchase insurance program, which covers items purchased on AMEX credit cards. Each credit card has a per-claim – or Purchase Protection Benefit -- limit of $10,000, and a yearly maximum claim limit of $50,000 per card. When AMEX approves a card holder's purchase insurance claim, AMEX electronically places a credit on that particular AMEX credit card.

c.     "Recoverable Depreciation" is money that USAA withholds from the initial claim payout until the item that the insured individual claims was lost, misplaced, or stolen is replaced and the insured provides proof of the same.

d.     "Renter's Insurance" is a type of insurance policy that can include replacement cost of nearly every item inside a rental property, and in most cases is not limited to the insured's residence. For example, if an insured's car is broken into and a laptop stolen, renter's insurance would cover it in most cases.

APR 1 1 2018

e.    "Umbrella Personal Protection" (UPP) is a USAA insurance policy that covers additional items not covered by auto insurance, home and renter's insurance or boat insurance.

f.    "USAA online claim system" or "USAA system" is an online messaging system that requires the customer (in this case, Chris and/or Tina DeMure) to login to their USAA account to be able to send and receive messages to USAA employees to include claim representatives.

g.    "USAA claim notes" encompass both USAA online claim system communication between the customer (the DeMures) and USAA claim representatives. Additionally, there are internal comments posted by USAA claim representatives regarding the specific claim, these comments are only viewable by USAA employees, and are included in the claim notes in a chronological manner.

h.    "Valuable Personal Protection" (VPP) is a USAA insurance policy designed to cover jewelry, silverware, fine arts, coins, cameras, guns, stamps, furs, and musical instruments. Most electronics are not covered by VPP. In order to receive VPP coverage, an appraisal and/or bill of sale is normally required to be provided to USAA.

## PROBABLE CAUSE

17.    Chris DeMure is a decorated United States Army officer with the rank of Lieutenant Colonel (O-5), currently assigned as the Battalion Commander of the 3rd Battalion, 509th Infantry (ABN). Chris DeMure graduated from West Point Military Academy in May 2000. He has served in several capacities within the regular Army and the special operations community. Chris DeMure is currently deployed to Afghanistan

APR 1 1 2018

and is scheduled to redeploy to Joint Base Elmendorf-Richardson (JBER), Anchorage, Alaska, in May 2018.

18.     Tina DeMure is Chris DeMure's spouse. The couple has been married throughout the scheme to defraud described herein. Tina DeMure is a nurse by training, is believed to work at a medical office in Anchorage, and resides on JBER.

19.     As noted above, according to Google **ctdemure@gmail.com** is a joint email account between Chris DeMure and Tina DeMure which was established by the DeMures on September 8, 2008.

20.     USAA Checking account ending in 0186, which is referenced below, is the bank account into which the USAA insurance claim payments were deposited. This joint account was controlled by Chris DeMure and Tina DeMure. The joint account was opened online on December 23, 2010, and **ctdemure@gmail.com** was listed on that account as the DeMures' primary email address.

21.     No later than approximately March 2008, and continuing until at least February 20, 2018, Chris DeMure and Tina DeMure engaged in a scheme to defraud two insurance providers by submitting false and fraudulent insurance claims for items that the DeMures claimed had been lost, stolen, or destroyed, in violation of the SUBJECT OFFENSES (*i.e.*, 18 U.S.C. §§ 1341, 1343). To date, this investigation has identified approximately $475,000 in loss to American Express (AMEX) and USAA Federal Savings Bank (USAA), combined.

//

//

APR 1 1 2018

22.     The DeMure's scheme to defraud involved the following:

•       The Purchases. The DeMures purchased items of value such as jewelry, high-end bicycles, clothing, and electronics, among other things. The DeMures purchased some of those items online and others in person. Often the items were purchased solely for the acquisition of the sales receipt. If purchased online, the purchase order confirmation and/or receipt was sent to **ctdemure@gmail.com**. At times, the DeMures would immediately cancel the online order or physically return the item to the store where they originally purchased it. If cancelled online, a cancellation confirmation from the respective vender was sent to **ctdemure@gmail.com**. As further explained below, AMEX's Purchase Protection Benefit limits the per-claim incident payout and cumulative yearly payout per AMEX credit card. The investigation to date shows that, at times, the DeMures structured their purchases at issue in their fraudulent AMEX claims in a way that maximized their overall claim benefit by using multiple AMEX credit cards to make certain purchases.

•       The Claims. Between 2008 and 2014, the DeMures only filed insurance claims with USAA. Thereafter, they filed insurance claims with both USAA and AMEX. The DeMures' USAA policies included homeowners and renters, valuable personal property (VPP), and umbrella personal protection (UPP) insurance. The DeMures' AMEX coverage was purchase protection for specific items purchased with the DeMures' AMEX cards.

APR 1 1 2018

The circumstances supporting those claims involved their items being lost, misplaced, or stolen. Since 2014, the DeMures have had multiple AMEX credit cards.

- <u>Supporting Documentation.</u> The DeMures submitted documentation to support the insurance claims they made with both USAA and AMEX. As further detailed below, this investigation has shown that some of the documents submitted by the DeMures were fraudulent (*e.g.*, police reports that the police department at issue has confirmed that they have no record of and did not issue). In addition to providing the aforementioned documentation, in many cases, both Chris DeMure and Tina DeMure provided USAA and/or AMEX with written and/or verbal narratives of the circumstances of their claimed loss.

- <u>Double Claims.</u> Beginning in approximately October 2015, the DeMures began to file parallel fraudulent insurance claims with both USAA and AMEX. That is, the DeMures filed insurance claims for many of the same items with both AMEX and USAA. In many cases, the DeMures provided different explanations for the loss, misplacement, or theft of these items, on the claim they filed with AMEX and the claim they filed with USAA. Additionally, on each claim they filed with AMEX, the DeMures affirmatively denied having a "primary homeowner's [or] renters . . . insurance policy," whereas in truth and fact they held homeowner's and

APR 1 1 2018

renters insurance policies through USAA. Additionally, in one instance,

Chris DeMure submitted a narrative regarding a claimed loss to AMEX and

provided the following information: "Insurance: I am currently stationed at

Fort Benning, GA and residing on-post in military quarters. We do not

have homeowner's insurance or renter's insurance as the government

assists us in the event of a fire, hurricane, etc. Unfortunately, this does not

cover any losses of item away from the military post." He included this

faxed statement in all three AMEX claims for this incident. The same day,

**INSURANCE INFORMATION**

Do you have a primary homeowner's, renters, condo owner, or business insurance policy?
Please check one of the boxes:

☐ Yes ☒ No  If 'Yes', please provide the following information:

Insurance Company Name: _____

Policy Number/Claim Number: _____

Agents/Adjuster's Telephone Number: _____

Deductible Amount: _____

the DeMures filed a duplicate renter's insurance claim with USAA.

- The Payouts. Of the approximately $475,000 that the DeMures claimed

  total from USAA and AMEX, they have received approximately $394,000

  in insurance payout/reimbursements from USAA and AMEX. As

  discussed below, the $394,000 that the DeMures have received in payouts

  from USAA and AMEX includes payments for claims that this

  investigation has identified as fraudulent either in whole or part. As more

  fully explained below, the DeMures were required to purchase like or

  similar items prior to USAA releasing the Recoverable Depreciation. In

  many instances, they purchased similar items online or in person simply to

APR 1 1 2018

obtain a purchase confirmation/receipt to provide to USAA. This proof of purchase would then release claim funds (Recoverable Depreciation) that were specific to that item. However, there is evidence to suggest that most of the items purchased to support the Recoverable Depreciation payout were returned/cancelled and the DeMures were fully refunded. In most online purchases/cancellations, the DeMures used **ctdemure@gmail.com** to effect each transaction.

- Payout Benefits. Evidence suggests much of the payout money the DeMures obtained through fraudulent means was used to pay down mortgage loans, automobile loans, and other debts.

**EXEMPLATIVE FRAUDULENT INSURANCE CLAIMS**

23.    In the paragraphs that follow, several of the insurance claims that the DeMures filed with USAA and/or AMEX, and which this investigation has shown were fraudulent, are detailed.

*MISSING PEARL – March 28, 2008, and May 23, 2009*

24.    On March 31, 2008, Tina DeMure filed a VPP claim with USAA for the loss of the pearl from her Tahitian pearl ring, which was purchased from Albert's Diamond Jewelers on March 28, 2008.

25.    In her claim submitted to USAA, Tina DeMure stated that, on March 28, 2008, she was out with friends for dinner and drinks and noticed the pearl in her Tahitian pearl ring was missing.

APR 1 1 2018

26.     According to a sales receipt the FBI obtained from Albert's Diamond Jewelers in Indiana, Tina DeMure's Tahitian pearl ring (item #CRPRL03043) was purchased by Tina DeMure on December 26, 2007, for $1,325.99.

27.     Tina DeMure communicated with USAA regarding this claim using her Yahoo! email account, tinademure@yahoo.com.

28.     On April 25, 2008, the USAA claim notes indicate that USAA sent Tina DeMure an Electronic Funds Transfer (EFT) in the amount of $301.74 for the reimbursement of the missing pearl.

29.     On May 21, 2009, Tina DeMure traded in her Tahitian pearl ring (item #CRPRL03043) at Albert's Diamond Jewelers for a 1 carat diamond ring.

30.     On May 23, 2009, two days after Tina DeMure returned the Tahitian pearl ring to Albert's Diamond Jewelers, she submitted a second claim with USAA – this time, a VPP insurance claim -- for the loss of what appears to be the pearl in the same Tahitian pearl ring.

31.     On June 26, 2009, USAA issued an EFT to the DeMures on their VPP claim in amount of $301.74 for the pearl ring.

*GARAGE BURGLARY – September 28, 2014*

32.     On September 28, 2014, Chris DeMure reported to the Steilacoom Police Department (SPD) (SPD Incident #142710360), a burglary of the attached garage at the DeMures' residence located at 2726 Worthington Street, Steilacoom, WA.

33.     SPD Officer Lawrence Whelan responded to the DeMure residence and made note of no forced entry into the attached garage. Officer Whelan reported that


APR 1 1 2018

Chris DeMure claimed the incident occurred sometime between 11:00pm on September 27, 2014 and 7:00am on September 28, 2014. Officer Whelan noted the items Chris DeMure reported stolen as follows, with losses totaling $4,700:

- Cervelo road bicycle (white/gray/blue) valued at approximately $3,500
- Trek mountain bike (red/black) valued at approximately $1,000
- Craftsman drill valued at approximately $100
- Craftsman toolbox (red/black) with assorted tools valued at approximately $100

34. At a later unknown date, Chris DeMure provided an enhanced itemized list of reportedly stolen items from the incident to the SPD.

35. Officer Whelan noted in his report that Chris DeMure was unsure how the burglary happened because the door was left secure and there were no signs of forced entry.

36. On October 2, 2014, the DeMures filed a homeowner's insurance claim with USAA using their online claim system (hereinafter "the USAA system"). On October 3, 2014, USAA sent the DeMures confirmation emails of the aforementioned claim to **ctdemure@gmail.com**, and to tinademure@yahoo.com.

37. On October 2, 2014, USAA Claim Representative Kristen Andrews quoted Chris DeMure in the claim notes within the USAA system as saying, "there was no damage to the garage, but the burglars took all items from our attached garage."

38. On October 4, 2014, Chris DeMure wrote an electronic communication within the USAA system stating in part, "The largest losses are the four bikes for my wife and I. We are both very competitive cyclists, and I have also competed in multiple Ironman triathlons. These bikes are pricier than normal, but also included competition

APR 1 1 2018

wheels…Please let me know if you need me to send the excel document with the complete list of losses and their individual values."

39.    On October 6, 2014, USAA Claim Representative Steven Mcbride replied to the DeMures via the USAA system stating in part, "We will need the complete list of the stolen items…You can attach it to this communication center…We will also need verification of ownership for the claimed item. This can be receipts, photos, appraisals, etc."

40.    On October 7, 2014, Chris DeMure replied within the USAA system as follows:

> "Apologize for the delay. I am in a 2-week exercise with the Rangers, my wife just had a baby daughter, and we are moving at the end of the month to Fort Benning…I have attached a number of documents in regard to our stolen property…The first is the overview of replacement value for the 4x bikes as well as the small tools/power tools that were taken. - Next document is my American Express statement for when we purchased the two bike (sic) for Tina – her mountain bike and road bike. These purchases were made from Nytro Multisports (near San Diego, CA). Her mountain bike is not worth $1200 (you will see a charge for $1200), but the purchase also included pedals, etc. – Next document is the appraisal that I had a bike store in Kansas conduct when I was at CGSC before moving to my current assignment with the Rangers.[2] When I came from graduate school, we had a good amount of furniture damaged as items went into storage. We wanted to avoid a constant debate about price with the movers, so I had Bike Source verify (and pack) my bikes. – I am trying to get a receipt from Placid Planet Bikes for my other bikes, but I closed the credit card around a year ago. I did attach a photo from a full Ironman (that's me) with the Zipp 404s. – Other pictures are of the road bike (Cervelo S3) and Zipp 808s when I had them packed in Kansas. – REI order details for bike computer and info about the Zipps."

---

[2] The referenced bike store is Bike Source, now known as Erik's, whose parent company is MidWest Merchandising dba Bike Source. CGSC is believed to stand for the U.S. Army's Command and General Staff College.



APR 1 1 2018

41.     Chris DeMure attached a PDF document to the referenced message detailed above in paragraph 40. The document included a breakdown of losses totaling $19,990.95:

- An appraisal from a company referred to as Bike Source
- An online receipt from Recreational Equipment Inc. (REI)
- Two separate online articles from Zipp notating the manufacturer's retail price of the wheels
- A photograph (hereinafter "Photograph #1") purporting to be Chris DeMure riding a Felt bicycle in the Louisville Ironman competition that was reported stolen
- A photograph (hereinafter "Photograph #2") reported to be Chris DeMure's Cervelo S3 bicycle leaning against a wall
- A photograph (hereinafter "Photograph #3") of two (2) Zipp wheels leaning against a wall
- An AMEX statement in Chris DeMure's name showing a $1,200 purchase from Nytro Multisports on February 15, 2009 and another purchase from Nytro Multisports in the amount of $3,984.82 on February 17, 2009

42.     With regards to the above referenced documents Chris DeMure sent USAA, your affiant has obtained records from Midwest Merchandising Inc. (doing business as Bike Source), Nytro Multisports and PhotoBucket. Chris Decker, Chief Financial Officer of Bike Source forwarded your affiant an e-mail from Craig Stoeltzing, the Bike Source (now known as Erik's) store manager in Overland Park, Kansas (the same store Chris DeMure claimed to have had his bicycles appraised at). Stoeltzing reviewed the appraisal document Chris DeMure submitted to USAA to support his insurance claim. Stoeltzing made the following observations about the appraisal report, noting the following observations:

"A couple things I noticed: 1. In an instance such as this, we would note what was on the bike and condition but not put a dollar amount on it. I instilled,



APR 1 1 2018

as much as possible, in staff that the value of the bike was between the customer, insurance company, carrier, etc. It's not up to us to determine value. **We aren't appraisers.** 2. The lack of a model year is a red flag even if we did screw up and estimate the value. I'm almost positive we wouldn't value a bike without a year. 3. We wouldn't note that the wheelset was being shipped with the bike unless we actually shipped the bike. 4. I agree on the letterhead. It almost looks like a register receipt and the address font doesn't look like anything I ever used, but I could be mistaken. 5. The "Thank you for your business!" at the bottom would not be something I'd normally put on any type of estimate like this. 6. To me the biggest red flag is that we didn't do it on a work order estimate. That seems extremely odd. We always tried to have a digital paper trail for something like this."

(emphasis added).

43.     In furtherance of the investigation, FBI conducted a reverse image search of publically available images through Google and Bing of the photographs Chris DeMure submitted to USAA to support his insurance claim. As a result, the FBI determined Photograph #2 was posted to a PhotoBucket account under user ID: Chedow. Photograph #2 was identified as "IMG-0873." Records obtained from PhotoBucket regarding Photograph #2 show that user ID "Chedow" was registered by Pieter Helsen, from the country of Belgium. Helsen uploaded "IMG-0873" to PhotoBucket on April 18, 2014. "IMG-0873" (Photograph #2) was submitted to USAA by Chris DeMure as his own bicycle on October 7, 2014.

44.     On October 7, 2014, USAA Claim Representative Kristen Andrews replied to the DeMures within the USAA system about their garage burglary claim: "Due to the size of your loss, I am referring your file to a new adjuster…we do still need a statement so at some point, please call us so that we can obtain that statement and discuss your policy."

APR 1 1 2018

45. On October 7, 2014, USAA Claim Representative Lariane Chapman was assigned the DeMure's case for this claim. Chapman sent the DeMures the following message within the USAA system: "Thank you for the information. Please allow us a couple weeks to process this for you. I will be calling to get the recorded statement."

46. On October 8, 2014, Chris DeMure wrote: "Laraine, Thanks so much and please let me know what you need. I am in a large training event the next couple weeks...lots of parachute jumps!"

47. On October 15, 2014, USAA Claim Representative Chapman called Chris DeMure for a recorded statement. In USAA's transcription of that call, Chris DeMure confirmed to Chapman that four (4) bicycles and power tools were stolen from their garage. Chris DeMure surmised that someone either had his code to get into the garage or somehow it was left open.

48. On October 24, 2014, Chris DeMure wrote to USAA Claim Representative Chapman over the USAA system, "Hi Lorraine, I provided a copy of all of the paperwork to the Steilacoom police department. Is there anything else you need from me? I am going to deploy in a couple weeks and would like to complete this before I depart." Shortly thereafter, Chapman replied that she would see if she could wrap it up that day.

49. USAA was required to research the replacement value of the DeMure's claimed bicycles. At 1:49pm CST on October 27, 2014, Chris DeMure wrote to USAA Claim Representative Chapman over the USAA system: "Sounds good Laraine. Will I be able to still get replacement value of the bikes as long as I purchase a new one (I believe you said within 6 months) and send you the receipts?"



APR 1 2 2018

50.    On November 6, 2014 at 6:08pm CST, USAA Claim Representative Chapman notified the DeMures via the USAA system: "The manager approved the estimate in the amount of $27,328.29. We hold back a portion of the fund on each item until the item is replaced. The total amount held back is (9,176.42) less the Deductible (1,000.00) total payment today $17,151.87."

51.    On November 6, 2014 at 6:40pm CST, Chris DeMure sent the following message to USAA Claim Representative Chapman: "In order to gain the additional amount that is held back ($9100 or so), do you just need the receipt from the bike store when I purchase additional bikes? You had mentioned that I would have six months, which would be ideal since I am about to head overseas with the Rangers. Also, the electronic funds transfer is fine; the account named Checking (ends in 0186) is best." Chapman confirmed with Chris DeMure that when the bicycles were replaced, USAA would issue the Recoverable Depreciation to the DeMures for that item. USAA issued a payment to the DeMures for $17,151.87.

52.    On November 25, 2014, Chris DeMure sent USAA Claim Representative Chapman the following message via the USAA system:

> "Hi Laraine, My wife and I are starting to look at purchasing some bikes and equipment. In order to recover the remaining Replacement Cost (RC) Benefits, do we have to purchase each of the individual items (pedals, gear bag, etc.) or will the cost of a bike cover that? For instance, the #1 item on the list is a Trek Mountain Bike with a RC Benefit of $440.41. The #2 below it is a headlight with a $29.19 benefit. The pedals below (# 3 item) have an RC Benefit of $53.13. Am I able to purchase a bike and that covers the cost all three items, or do you recommend I submit receipts for the new purchase of all three items? Also, does the new purchase price have to be higher than the remaining RC Benefit or does it need to the "Estimated Amount" on the



APR 1 7 2018

spreadsheet? I am currently deployed, so my wife may write back if I am not on the net."

53.     Shortly thereafter, USAA Claims Representative Ginia Romero replied to the DeMures via the USAA system: "If the replacement bike includes the headlight and pedals then you can submit one receipt for all three items. When you send the receipts please make sure to state what items on the list it replaces. In order to recover the depreciation, the total amount for all three must be the amount we estimated to replace all three. If it is any less then you will only get the difference between what we have already paid out and what it costs you to replace them."

54.     On December 29, 2014, Chris DeMure sent USAA Claim Representative Chapman a message via the USAA system telling her that he attached a receipt showing recent recoverable purchases. The attached document was an online order confirmation (#87031175) dated December 28, 2014 generated by REI and sent to the DeMures. Chris DeMure is listed as the billed party. REI sent this order confirmation was sent to **ctdemure@gmail.com**. There were 14 total items ordered in the amount of $5,525.43.

55.     Records obtained from REI regarding the DeMure's purchase and return history show that the DeMures cancelled the aforementioned order (#87031175) placed on December 28, 2014, and never paid for nor received the replacement items.

56.     On December 30, 2014 at 1:23pm CST, Chapman notified the DeMures that $1,440.87 was available via electronic funds transfer (EFT). Shortly thereafter at 5:20pm CST, Tina DeMure sent the following message via the USAA system: "Hi



APR 1 1 2018

Lorraine, an electronic funds transfer [EFT] would be fine, preferably to our primary checking account (it ends with 0186). Thanks, Tina."

57.     On December 30, 2014, USAA paid out the DeMures $1,440.87 via EFT.

58.     On January 12, 2015, USAA paid the DeMures an additional $3,930.97 via EFT.

59.     On February 12, 2015, Chris DeMure sent the following message via the USAA system: "Hi Lariane, Please find the rest of the items; we were trying to get this done and get everything shipped before a) I redeploy from overseas and b) Tina changes homes…"

60.     On February 14, 2015, USAA paid the DeMures $3,630.08 via EFT.

61.     On February 16, 2015, in all, USAA paid the DeMures a total of $26,153.79 for their October 2, 2014 claim related to the garage burglary they reported in Steilacoom, WA.

*BAG LEFT IN DRIVEWAY IN CROWN POINT, INDIANA – October 19, 2015*

62.     On or before October 19, 2015, the DeMures filed a claim with USAA regarding misplaced luggage in Crown Point, Indiana.

63.     USAA assigned the date of loss as October 19, 2015.  On October 27, 2015, USAA sent the DeMures a confirmation email regarding this claim to **ctdemure@gmail.com**.

64.     On October 22, 2015, Chris DeMure provided information to the Crown Point Police Department (CPPD) (CCPD Incident #15CP13717), regarding stolen property at a residence located at 1615 W. 95th Ave., Crown Point, IN.  The police report narrative

APR 1 1 2018

written by Cpl. M. Needham stated: "Complainant [Chris DeMure] requested a report for stolen property which was left on the driveway when he was back en route to Georgia. Subject was given an event number for insurance purposes."

65.     On October 27, 2015, USAA Claims Representative Barbara Rodriguez called Chris DeMure for a recorded statement regarding the claim. According to USAA's transcription of the call, Chris DeMure stated as his family was getting ready to go to the Chicago O'Hare Airport, they inadvertently left two (2) bags as they shuffled the bags between vehicles in the driveway of Chris DeMure's mother's house in Crown Point, IN. Chris DeMure noticed the bags were missing once they were en-route. Chris DeMure called his mother and her neighbors and they stated that they had not seen nor picked up the bags. Once the DeMures arrived at their destination (Georgia), Chris DeMure called the CPPD to file a police report.

66.     USAA separated the items claimed by the DeMures into nine distinct categories: "artwork; cameras, camcorders & equip.; clothing & accessories; computers & related goods; electronics; jewelry & watches; luggage, bags & accessories; personal care & beauty; sporting goods & outdoors." The "summary for contents" issued by USAA included 86 items. Chris DeMure reported all claimed items were packed in two black travel bags.

67.     On November 16, 2015, USAA Claims Representative Amber Banton wrote Chris DeMure a message via the USAA online system: "Hello, in regards to your content list, I do need to discuss some things with you. I have called a couple times and

APR 1 1 2018

left a message…We do need you to itemize your list a bit better in regards to how may (sic) suits with each individual amount, shoes, etc."

68.     The following day, November 17, 2015, Chris DeMure replied: "Amber, No problem. I actually just got flew back from Korea visiting some of our guys…" A few hours later that same day, Chris DeMure wrote "Amber, I am jumping tonight, but please find two files attached…"

69.     On December 4, 2015, USAA Claims Representative Banton wrote Chris DeMure, "Were all the items on the receipt taken?" On December 7, 2015, Chris DeMure replied, "They unfortunately were. All of the "new" items that we purchased were packed in separate bags, which unfortunately were the ones left behind on the driveway…" All of the physical receipts the DeMures submitted for this claim reflected purchase dates between October 4, 2015 and October 15, 2015, with a vast majority of them being from retail stores in California. All electronic purchases that the DeMures included in this claim (Amazon, Microsoft, Quicken, and Apple) occurred between September 20, 2015, and October 6, 2015, listed **ctdemure@gmail.com** on the electronic purchase receipts for Microsoft, Quicken, and Apple.

70.     On December 8, 2015, USAA Claims Representative Banton asked Chris DeMure to help her clarify items on a receipt. The following day Chris DeMure replied: "No problem. I'm at Fort Bragg right now but will knock this out once I get back to Fort Benning."



AFR 1 1 2018

71.     On December 30, 2015, USAA Claims Representative Banton sent a message to Chris DeMure asking him to review the estimate and to say "accept" if it was agreeable.

72.     On January 6, 2016, Chris DeMure responded:

"Hi Amber, everything looks good for the most part, but I believe some items were left off. When [*sic*] I included added up the original receipts, the total is quite a bit higher than what on the estimate. I included the original document that I submitted. For instance, I [Unintelligible] any men's suits or footwear (Allen Edmonds) in the recent estimate."

73.     Between January 12, 2016, and February 3, 2016, USAA Claims Representative Banton and Chris DeMure exchanged additional messages to finalize the payment amount. At one point on January 15, 2016, Banton questioned Chris DeMure regarding his claim saying "the receipts and content form are not adding up making it difficult to add the content list for you." After Chris DeMure provided receipts, a final content collaboration estimate (dated February 3, 2015), and payment was issued.

74.     On February 3, 2016, a payment of $17,779.93 was issued via EFT to the DeMures. That same day, USAA sent an email confirmation to **ctdemure@gmail.com** regarding the aforementioned EFT payment.

75.     In addition to filing the aforementioned claim with USAA, the DeMures filed parallel claims with AMEX for the same incident.

76.     When filing the claims with AMEX on October 26, 2015, Chris DeMure submitted the following narrative regarding the claimed loss: "Insurance: I am currently stationed at Fort Benning, GA and residing on-post in military quarters. We do not have homeowner's insurance or renter's insurance as the government assists us in the event of

APR 1 1 2018

a fire, hurricane, etc. Unfortunately, this does not cover any losses of item away from the military post." Chris DeMure faxed the aforementioned statement to AMEX along with the three AMEX claims on October 26, 2015 (*i.e.*, the same day the DeMures filed the duplicate claim with USAA under renter's insurance).

77.     On October 26, 2015, the DeMures faxed a 16-page claim form to AMEX requesting Purchase Protection Benefit reimbursement for several items that they were reported misplaced/stolen from Chris DeMure's mother's driveway in Crown Point, IN, on October 19, 2015. The total amount Chris DeMure claimed for his AMEX card number 3723 272364 03009 was $9,117.12. **Ctdemure@gmail.com** was included on the AMEX claim form.

78.     On October 26, 2015, the DeMures faxed an 8-page claim form to AMEX requesting Purchase Protection Benefit reimbursement for several additional items that they reported were misplaced/stolen from Chris DeMure's mother's driveway in Crown Point, IN, on October 19, 2015. The total amount Chris DeMure claimed for his AMEX card number 3712 457001 11000 was $781.73. **Ctdemure@gmail.com** was included on the AMEX claim form.

79.     On October 26, 2015, the DeMures faxed a 19-page claim form to AMEX requesting Purchase Protection Benefit reimbursement for several items that they reported were misplaced/stolen from Chris DeMure's mother's driveway in Crown Point, IN, on October 19, 2015. The total amount Chris DeMure claimed for his AMEX card number 3712 457001 11000 was $8,979.11. **Ctdemure@gmail.com** was included on the AMEX claim form.

80. On November 18, 2015, in support of their fraudulent AMEX claims, the DeMures faxed the same Crown Point Police Department report that they submitted to USAA, as well as an itemized list of lost or stolen items from the incident. Therein, the DeMures claimed the total value of the property they named in their AMEX claims was $18,877.96. Why AMEX denied a sizeable portion of the DeMures' claim is unclear at this time.

81. AMEX provided the FBI with documents related to this investigation. To date, however, AMEX has not provided all of the DeMures' credit card statements. On the statements provided, the DeMures' Purchase Protection Benefit Payment was listed as a credit to the respective card accounts. The statements did not identify which claims the payments were associated with. As a result, investigators have not yet been able to fully identify which claim is associated with each payment credit that the DeMures have received from AMEX. This is the case for every AMEX claim payment to the DeMures which is discussed in this affidavit.

82. AMEX card number 3723 272364 03009, assigned to Chris DeMure, received a Purchase Protection Benefit Payment from AMEX on December 2, 2015, in the amount of $3,736.66.

83. AMEX card number 3712 457001 11000, assigned to Chris DeMure, received a Purchase Protection Benefit Payment from AMEX on November 9, 2015, in the amount of $5,318.68, and on December 2, 2015 in the amount of $126.36, respectively.



84. The total amount the DeMures received from AMEX for the reported misplaced/stolen items from Chris DeMure's mother's driveway in Crown Point, IN, was $9,181.70.

85. Taken together, the DeMures received a total of $26,961.63 from their AMEX and USAA claims for the misplaced items.

### *MISSING DIAMOND EARRINGS – February 23, 2016*

86. On February 29, 2016, the DeMures faxed a purchase protection claim form to AMEX reporting the loss of 2.46 carat diamond earrings, which noted the loss date was February 23, 2016. The DeMures claimed the earrings were purchased on December 5, 2015, from James & Sons jewelers in Schererville, IN, for $11,065. The DeMures provided an appraisal for 2.46 carat diamond earrings to AMEX in support of this claim. The DeMures listed **Ctdemure@gmail.com** on the form. The AMEX claim form the DeMures submitted described the details of the loss as "wife lost earrings during a jog."

87. On March 21, 2016, AMEX credited Chris DeMure's AMEX credit card $10,000 for the loss of the aforementioned diamond earrings. As noted above, AMEX's purchase protection policy limits the payment per claim to $10,000, regardless of the lost items' value.

88. On March 25, 2016, USAA's Special Investigative Unit (SIU) conducted a background inquiry and noted in a section titled: "Recent changes to policy affecting SIU referral claim (in the last 30 days from DOL)", under "Reason for the change", "Eff 03-25-16 jewellry [*sic*] coverage was increased." DOL is understood to mean date of

APR 1 1 2018

loss. How much the DeMures increased their USAA insurance coverage is unclear at this time.

89.     On March 27, 2016, the DeMures filed a claim with USAA for a set of 2.46 carat diamond earrings listing the date of loss as March 26, 2016. On March 28, 2016, USAA sent an email claim verification to **ctdemure@gmail.com**, as well as to tinademure@yahoo.com.

90.     On March 28, 2016, USAA Claim Representative Justin Waterfield recorded his conversation with Chris DeMure regarding the loss of the aforementioned earrings. USAA's transcription of that call includes the following statement from Chris DeMure:

> "[M]y wife was wearing the earrings I got her for Christmas and it's a Christmas and birthday gift this year. And we think on Saturday, I think it was the 26th, we live right here by the Riverwalk, she went out for a jog with the baby in the little jogging stroller, I don't know if they just didn't stay on her or what but came off. She found one'a [sic] the backings in the hood of her running jacket…"

91.     In the same recorded interview, Chris DeMure confirmed that both of the screw-back style earrings went missing. Chris DeMure further identified the earrings were purchased from James & Sons.

92.     To support the USAA claim, the DeMures submitted a James & Sons jewelry appraisal, rather than the original purchase receipt that they previously submitted to AMEX. This appraisal listed the replacement value of the earrings as $12,900 and was dated December 23, 2015 (*i.e.*, 18 days after the DeMures purchased the earrings).

APR 1 1 2018

93.     As noted above, unlike AMEX, USAA does not have a per-claim payment limit.

94.     USAA Claim Representative Waterfield raised an internal USAA alert regarding the screw back style earrings being lost during a jog noting that screw back style earrings are more secure than typical earring fasteners. Waterfield submitted the DeMure's claim to USAA's Special Investigative Unit (SIU) based on four previous VPP claims and the unlikelihood of screw-on earrings being lost on a jog. After an investigation, SIU concluded their review of the claim and allowed normal handling to proceed.

95.     On April 5, 2016, Chris DeMure responded to a voicemail from USAA Claim Representative Waterfield via the USAA system, writing that he would prefer to have the settlement distributed to the DeMures' primary checking account ending in 0186.

96.     Shortly thereafter, USAA issued payment of $12,900 to the DeMures and sent confirmation emails to both **ctdemure@gmail.com** and tinademure@yahoo.com.

97.     In all, the DeMures obtained $22,900 for the diamond earrings, which were appraised at $12,900 and purchased for $11,065, from their parallel USAA and AMEX claims.

*LOUISVILLE UHAUL BURGLARY – July 20, 2016*

98.     On July 19, 2016, the DeMures increased their USAA VPP limit. That value increase is not known at this time.

APR 1 1 2018

99.     On July 21, 2016, the DeMures notified USAA that a UHAUL trailer they rented had been burglarized in a hotel parking lot in Louisville, KY, on July 20, 2016. USAA sent an email confirmation of the claim to both **ctdemure@gmail.com** and tinademure@yahoo.com.

100.    Shortly after opening the claim, USAA personnel referred the matter to SIU on account of the DeMures having made two or more property theft losses within the previous three years.

101.    The DeMures filed the police report one day after the USAA claim was initiated and after they had departed Louisville, KY.

102.    Chelsea Banach, a Service Center Technician at the Louisville Metro Police Department (LMPD), took Chris DeMure's complaint on July 22, 2016 regarding the UHAUL burglary. According to Banach, during that call, Chris DeMure said he and his family were staying at a hotel in the Louisville area while they were in the process of moving. Banach recalls that Chris DeMure told her that he was in the military. Banach explained to Chris DeMure that LMPD does not usually take theft reports exceeding $10,000 over the telephone, but made an exception for Chris DeMure because he was in the process of moving and only passing through Louisville. After taking Chris DeMure's incident report over the telephone, Banach did not request a police officer respond to the scene to verify Chris DeMure's claim and she confirmed that no officer went to the scene. Banach further recalled Chris DeMure telling her the items were stolen from a trailer they were towing. Banach opined that the area where Chris DeMure claimed his trailer was broken into was in the good part of Louisville with very little crime. The

APR 1 1 2018

LMPD report noted that Chris DeMure reported an estimated loss amount of $215,317.68.

103.    Six Continent Hotels, the parent company of Staybridge Suites, confirmed the DeMures stayed at the Staybridge Suites in Louisville, KY, on July 20, 2016. Additionally, UHAUL confirmed the DeMures rented a UHAUL trailer in Columbus, GA, on July 18, 2016 and returned it in Crown Point, IN, on July 22, 2016. The details of this one-way UHAUL rental were scheduled on July 8, 2016, suggesting the DeMures had prior intention to terminate the UHAUL rental over 3,000 miles short of their new military posting in Alaska. At that time, Chris DeMure was permanently changing duty stations from Fort Benning, GA, to Joint Base Elmendorf-Richardson (JBER), AK.

104.    On July 22, 2016, Chris DeMure wrote a message on the USAA system stating the following:

> "I am currently gathering the complete inventory of items – it essentially the majority of our clothes, shoes, etc. (we generally travel with all of our clothes since the moving truck doesn't arrive for a little while), the two bikes, jewelry, etc. I spoke to the Louisville Police Department and they have started a police report...I am working with of [*sic*] their officers and will ensure their police report has a complete inventory of the missing items."

105.    USAA broke down the DeMure's claim into 11 distinct categories: clothing & accessories; computers & related goods; electronics; furniture-home & office; health & medical supplies; housewares-home décor; infant & baby related goods; jewelry & watches; linens & soft goods; luggage, bags & accessories; and sporting goods & outdoors. USAA divided the total claim into two separate claims: (1) jewelry; and (2) non-jewelry items (everything else). These claims are discussed in turn below.



APR 1 1 2018

*Louisville UHAUL Burglary - Jewelry*

106.   On September 20, 2016, the DeMures submitted a detailed accounting of all the jewelry that was supposedly stolen from the UHAUL trailer at the Staybridge Suites in Louisville, KY on July 20, 2016.

107.   On October 13, 2016, this USAA claim was referred to the USAA's SIU for further investigation.  SIU concluded that there was no apparent/immediate SIU indicators at that time and completed the review.

108.   On November 3, 2016, USAA Claims Representative Travis Robbins sent a message to the DeMures via the USAA system stating: "we have almost got everything in line for settlement."  Robbins also requested additional paperwork and photographs for some of the jewelry.  That same day, Chris DeMure responded he would check with the jeweler in Columbus, GA.

109.   On November 11, 2016, USAA Claims Representative Eric Pogue sent a message to the DeMures via the USAA system stating: "In order to provide proof of ownership of the items, we request copies of the original appraisals.  If these are not available to you, you can provide photos of the item, an original purchase receipt for the items, or photos."

110.   On several occasions thereafter, Chris DeMure was requested to provide further documentation by a variety of USAA claims representatives.  On November 17, 2016, Chris DeMure responded "a good amount of my paperwork was stolen from the u-haul [*sic*] trailer during the theft."

APR 1 1 2018

111.   On November 22, 2016, USAA Claims Representative Robbins wrote on the USAA system, "Hey Colonel…the contact we work with at Tiffany's has not been able to locate the original order and they have traced back all the way to 1995. Do you have the order information or was this purchased under a different name?"

112.   On November 23, 2016, Chris DeMure replied:

"Travis, The last name was Dombrowski (that is my wife's grandmother who we inherited from), but I'm not sure how she acquired it or if she purchased it from someone else. Please let me know if you need the appraisals. I can get those from the jewelry store in Columbus, GA where we got the items appraised."

113.   Records from Ross-Simons show that Chris DeMure purchased a Tiffany necklace matching the description of that in the claim on June 1, 2016 for $16,496.25. The necklace was described as "PLAT/18KW TIFFANY&CO 3-STRAND MESH NECK." On June 15, 2016, the DeMures had that necklace appraised for $35,000 by the Jeweler's Touch in Columbus, GA. On July 6, 2016, Chris DeMure returned this necklace to Ross-Simons for a full refund, claiming that Tina DeMure did not like it. (As noted above, the date of loss Chris DeMure provided to USAA was July 20, 2016, that is, after Chris DeMure returned the necklace for a full refund.) Chris DeMure later claimed to USAA that this piece of jewelry was a family heirloom, when in fact the aforementioned records show that he purchased the vintage necklace in June 2016 and owned it for approximately five-weeks. Additionally, upon returning the necklace to Ross-Simons, Ross-Simons opened a fraud case (#97679) with AMEX as a precaution. Ross-Simons received a reply from AMEX stating the "order was good" and no further action was seemingly taken.

114. On November 28, 2016, the DeMures submitted several appraisals from The Jewelers Touch in Columbus, GA, via the USAA system, to include the two Tiffany appraisals.

115. On January 2, 2017, USAA Claims Representative Robbins notified Chris DeMure of the following:

> "Colonel, I wanted to let you know I have gotten responses on all items with exception to the eternity ring we are still waiting on verification on that ring. The only other issue we are running into is with the Tiffany Necklace. Since we have a direct relationship with Tiffany and Co we try to see if the item is still available. They are not showing any item matching the description for the necklace in their catalog history nor are they able to find the purchase history itself. I had the gemologist come up with a price for replacement as if this was not a Tiffany and Co item."

116. Shortly thereafter, Chris DeMure responded to USAA Claims Representative Robbins via the USAA system with the following: "Regarding the necklace, I know the appraiser mentioned it said Tiffany & Co on the piece; however, this originally belonged to my wife's grandmother so I know it is definitely a vintage/antique piece of jewelry."

117. The DeMures' USAA claim from the July 20, 2016, Louisville UHAUL burglary also included a second Tiffany & Co. necklace. Records the FBI obtained from Ross-Simmons jewelers show that Chris DeMure purchased a "PLAT TIFFANY & CO DIAMOND TEAR DROP NECK," on June 1, 2016 from Ross-Simons jewelers for $5,996.25. On June 15, 2016, the necklace was appraised by the Jeweler's Touch in Columbus, GA, for $3,500. Records the FBI obtained from Ross-Simmons show that, on July 6, 2016, Chris DeMure returned the aforementioned necklace to Ross-Simons for a



APR 1 1 2018

full refund, claiming that Tina DeMure did not like it. On July 20, 2016, Chris DeMure claimed this necklace was stolen from the UHAUL trailer in Louisville, KY. USAA approved payment for $3,500 as reimbursement for this necklace. This amount was included in the above referenced $100,509 claim settlement.

118.    On January 4 and 12, 2017, USAA Claims Representative Robbins sent Chris DeMure a detailed settlement valuation for six pieces of jewelry totaling $90,014. The vintage Tiffany necklace discussed in the above paragraph was not included in that estimate because USAA had been unable to verify its purchase and value with Tiffany & Co., coupled with a USAA gemologist valued the piece at $17,000 rather than the appraised value of $35,000 per the documents submitted by the DeMures.

119.    On January 23, 2017, USAA closed this claim due to the lack of response from the DeMures on the USAA system. On the same day, USAA sent a letter to **ctdemure@gmail.com** notifying the DeMures of this claim closure.

120.    Later the same day, Chris DeMure wrote a reply to USAA Claims Representative Robbins on the USAA system:

> "Travis, I just returned from the Northern Mountain Training Center last night…Just saw the email that the claim has been closed and it was also not available when I went to USAA's website. Honestly, I am surprised that you guys did not call my phone or my wife's phone; she had both while I was TDY."

121.    On January 25, 2017, Chris DeMure sent USAA Claims Representative Robbins the following message over the USAA system:

> "Travis, please let me know if it is easier to discuss on the phone, but here are the key points: 1) There are numerous items on the police report that were not included in the six items you quoted. Specifically, it should be Tacori



earrings ($995), Mikimoto 18" pearl necklace ($3500), Lady's octagon stud earrings ($2500), and Tiffany&Co teardrop filigree pendant ($3500.) 2) For the six items you mentioned, I did have a couple questions: - 16" chain with marquise diamonds: no issues ($18,463.92) – Omega black earrings: no issues ($4995.00) – Lady's eternity ring: No issue with the "round cut" for $20,636.02. – Lady's halo style pendant and chain. Can you confirm this price of $8064.76? (The item had a 1.50 ct diamond and I have not found anything similar for under $15K.) – Lady's eternity ring (asscher cut.) I believe this was originally purchased for somewhere near $35K. I have asked a number of reputable jewelry stores and I have not received a quote for under $38,000. I'm curious as to why it would only be $20,854.30, especially when it was appraised for twice as much and a number of other appraisers and jewelers estimate it much higher. – For the Tiffany necklace, this was an inherited piece on my wife's side. According to her family members, it was purchased in the 1950s or 1960s, well before the 1995 benchmark that the Tiffany rep mentioned. If you need additional last names, I can provide them; however, there is no question that it was purchased well before 1995."

122. Later the same day, USAA Claims Representative Robbins responded to Chris DeMure via the USAA system: "As far as the Tiffany necklace I will send the information back to the gem lab but they did contact Tiffany's and they have no record of the purchase, and they also stated they don't have anything in their inventory similar to this, but that may be due to the age."

123. On February 6, 2017, Chris DeMure wrote to USAA Claims Representative Robbins via the USAA system:

"Travis, Apologize for the delay – it has been an insane week, as we ramp for deployment to Afghanistan. Regarding potential names, here are a few on my wife's side. Her grandmother has passed away, but there are potential names of other family members. That particular piece was certainly purchased well before 1995: Guzik, Dombrowski, Johnson, Phillips, Peterson, and Barnes."

124. Between February 28, 2017, and March 3, 2017, Robbins and Chris DeMure traded messages via the USAA system regarding the vintage Tiffany & Co.



APR 1 1 2018

necklace. Robbins confirmed they could not verify the names provided by Chris DeMure due to privacy concerns and would only pay out the USAA gemologist's appraised value of $17,000 rather than the appraised value submitted by Chris DeMure for $35,000. Chris DeMure eventually agreed, and requested a final disbursement amount.

125. On March 6, 2017, USAA sent an email with an itemized description of the final settlement for $100,509 to **ctdemure@gmail.com**.

126. FBI interviewed USAA Manager Susan Simons. Simons confirmed USAA Check number 0017854022 in the amount of $100,509 was issued as a paper check and mailed to the DeMures.

*Louisville UHAUL Burglary - Non-Jewelry Items*

127. In addition to the jewelry claim submitted to USAA for the July 20, 2016, Louisville UHAUL burglary, the DeMures claimed a variety of non-jewelry items were stolen from the UHAUL trailer, as well. Those items included such things as men's/women's suits, various clothing, household goods, electronics, two Cervelo bicycles, and other items.

128. On August 17, 2016, Chris DeMure wrote a message to USAA Claims Representative Robbins via the USAA system stating in part: "I finally made it to Alaska…For your awareness, we moved with a large amount of our clothes in bags in the trailer." According to UHAUL records, the DeMures reserved a UHAUL trailer on July 8, 2016 for a one-way trip between July 18 and 22, 2016 from Columbus, GA to Crown Point, IN."

129.    On July 21, 2016, Chris DeMure included what appeared to be an invoice/appraisal for two bicycles from a company known as Barnes Competitive Cycling. An image of that document appears below:



130.    FBI conducted a business entity search for "Barnes Competitive Cycling" on the State of Indiana's Secretary of State Website. No records of a business with this name were found. Additionally, a search using the same Website for the address listed on the invoice/appraisal (7322 Trails End Ave, Schereville, IN 46375), returned one result; however, this business had no relation to "Barnes Competitive Cycling."

131.    FBI also conducted basic background research on the address listed in the above invoice/appraisal and found that 7322 Trails End Avenue, Schererville, IN, 46375,



was the residence of Tina DeMure's sister, Jennifer Barnes (hereinafter "Jennifer") and her husband Kenneth Barnes (hereinafter "Kenneth", collectively "the Barnes"). The Barnes resided at the aforementioned address from July 2013 through July 2016, which covered the date listed on the above referenced invoice/appraisal (April 23, 2016) that Chris DeMure provided to USAA in support of his claim.

132.    Chris DeMure's name, mailing address, and **ctdemure@gmail.com** were listed on the Barnes Competitive Cycling invoice/appraisal that the DeMures submitted to USAA.

133.    FBI interviewed Owen Gerard, a warranty customer service representative with the bicycle company, Cervelo. Gerard advised that the serial numbers listed in the above invoice/appraisal were not found in Cervelo's database. Gerard explained that the Cervelo bicycles with those serial numbers were not sold in North America, but could have been sold in Europe or Asia. Additionally, the invoice/appraisal described the Cervelo bicycles in millimeters ("mm"), when the bicycle industry customarily describes bicycles using centimeters ("cm"). Gerard also noted all retailers of Cervelo bicycles in North America and Europe are listed on the company's Website under "Retailers". "Barnes Competitive Cycling" is not listed on the Cervelo Website as a retailer.

134.    On September 21, 2016, Chris DeMure submitted seven (7) PDF documents containing receipts for the additional non-jewelry items from the reported trailer burglary incident in Louisville, KY.

135.    On October 3, 2016, USAA Claims Representative Robbins wrote to Chris DeMure in the online USAA system, "Chris, I have uploaded the replacement cost

estimate for the items that were stolen." The same day, Chris DeMure replied stating in part, "Out of curiosity, do I receive the depreciation amount when I show future purchases of similar items?"

136. On October 4, 2016, USAA Claims Representative Anna Mikkelsen wrote to Chris DeMure via the USAA system: "Yes sir, Colonel DeMure. This is exactly right, as you replace the items you send in the receipts and we will reimburse you. We can issue payment to you for $31,477.34. Would you like us to issue payment by electronic funds transfer into your account with that last four digits of 2524?" Chris DeMure replied, "Please go ahead and issue payment. if possible, I would like to deposit it in my primary checking account; the last four numbers are 0186."

137. On October 4, 2016, USAA sent an email to **ctdemure@gmail.com**, which contained a letter notating the non-jewelry settlement amount of $31,477.34. The letter confirmed the payment was made by USAA to the DeMures via EFT.

138. The Recoverable Depreciation of the non-jewelry claimed items was $21,318.50. As noted above, USAA advises that to obtain Recoverable Depreciation value for an item the DeMures had to replace the non-jewelry items that were reported stolen with similar items and provide proof that they did so before USAA would pay the DeMures the applicable Recoverable Depreciation for each item.

139. On March 17, 2017, Chris DeMure sent USAA Claims Representative Robbins another message via the USAA system: "Can I submit receipts directly to you for purchases I have made since the loss? I understand that I received some



reimbursement shortly after the loss, and would gain the remainder after purchases were made."

140. The following day, USAA Claims Representative Vanessa Nesmith responded to Chris DeMure that he had to submit receipts in order to receive the Recoverable Depreciation value of the items he claimed were stolen.

141. As part of the Recoverable Depreciation reimbursement for the two stolen Cervelo bicycles, the DeMures purchased replacements from TriSports.com and R&A Cycles.

142. On July 4, 2017, the DeMures ordered one Argon bicycle from TriSports.com for $14,882.98 (including shipping charges). **Ctdemure@gmail.com** was listed on the invoice. Records from TriSports.com show that, on July 5, 2017, the TriSports.com purchase order was cancelled with a reason "customer changed mind." On July 12, 2017, Chris DeMure submitted the TriSports.com purchase confirmation of July 4, 2017, to USAA to support a Recoverable Depreciation payment of $8,500 for the replacement bicycle. Chris DeMure did not disclose to USAA the order was cancelled on July 5, 2017.

143. On July 4, 2017, the DeMures also ordered one Pinarello bicycle and associated gear from R&A Cycles for $17,594.99.

144. Philip Cabbad, Senior Advisor for Sales and Products, R&A Cycles, examined the R&A Cycles invoice reflecting a purchase by Chris DeMure of a bicycle. Cabbad advised as follows:



APR 1 1 20

"We received a subpoena in the mail the other day in reference to a purchase supposedly made by a Christopher James DeMure. Looking over our online system in reference to the charge in question and verifying with our payment service. There was NO charge in the amount indicated on the subpoena. Yes, an order was placed on our website for the items mentioned but in looking over the system, the charge was VOIDED. No order was placed or shipped."

145.    On July 12, 2017, Chris DeMure submitted the aforementioned R&A Cycles invoice to the USAA system to support the Recoverable Depreciation payment of $9,000. Chris DeMure did not disclose to USAA that the purchase of the bicycle was voided.

146.    On July 13, 2017, a notification of payment for $19,754.98 was emailed to **ctdemure@gmail.com**. Later in the day, USAA issued the payment via EFT to the DeMures.

147.    In addition to filing the jewelry and non-jewelry items with USAA, the DeMures also filed a parallel claim with AMEX for some of the items they claimed were stolen on July 21, 2016.

148.    On September 22, 2016 at 7:19pm GMT, the DeMures sent a 27-page fax to AMEX requesting Purchase Protection Benefit Reimbursement for several of the items reported stolen from the UHAUL in Louisville, KY on July 21, 2016. Your affiant points out that the date of loss for the same incident the DeMures filed with USAA was July 20, 2016. **Ctdemure@gmail.com** was listed on the AMEX claim form. The total amount claimed for Chris DeMure's AMEX card number 3712 457001 11000 was $9,990.70, $9.30 short of the per incident limit of $10,000.



149.    On October 6, 2016, at 7:12am GMT, the DeMures faxed a 3-page claim form to AMEX requesting Purchase Protection Benefit Reimbursement for several additional items reported stolen from the UHAUL in Louisville, KY on July 21, 2016. **Ctdemure@gmail.com** was listed on the AMEX claim form. The total amount claimed for Chris DeMure's AMEX card number 3712 457001 11000 was $2,048.37. Your affiant notes the AMEX card number referenced on both the September 22 and the October 6, 2016 claims are the same.

150.    On October 6, 2016, at 5:11pm GMT, the DeMures faxed a 37-page claim form to AMEX requesting Purchase Protection Benefit Reimbursement for several of the items reported stolen from the UHAUL in Louisville, KY, on July 21, 2016. In this particular fax, the coversheet specified the following documents were "required documentation for: Tina DeMure, claim #0010159160." **Ctdemure@gmail.com** was listed on the AMEX claim form. The total amount claimed for Tina DeMure's AMEX card number 3712 911134 41006 was $10,699.98.

151.    On October 8, 2016, at 5:20pm GMT, the DeMures faxed a 21-page claim form to AMEX requesting Purchase Protection Benefit Reimbursement for several of the items reported stolen from the UHAUL in Louisville, KY on July 21, 2016. **Ctdemure@gmail.com** was listed on the AMEX claim form. The total amount claimed for Chris DeMure's AMEX card number 3767 397217 71003 was $1,006.41.

152.    On October 8, 2016, at 6:22pm GMT, the DeMures faxed a 22-page claim form to AMEX requesting Purchase Protection Benefit Reimbursement for several of the items reported stolen from the UHAUL in Louisville, KY on July 21, 2016.

**Ctdemure@gmail.com** was listed on the AMEX claim form. The total amount claimed

for Chris DeMure's AMEX card number 3723 272364 03009 was $10,288.90.

153.    On October 18, 2016, at 3:35pm GMT, Tina DeMure faxed a 2-page

document with the following cover message: "We spoke to a representative this morning

on the phone and he asked us to send in a detailed receipt regarding an Amazon/Thred Up

order.  Please find the requested document attached.  Thanks, Tina DeMure 910-578-

8537."

154.    AMEX card number 3712 457001 11000, assigned to Chris DeMure,

received two AMEX Purchase Protection Benefit payments on October 10, 2016, for

$7,768.28 and $2,041.38.

155.    AMEX card number 3723 272364 03009, assigned to Chris DeMure,

received two AMEX Purchase Protection Benefit payments on October 24 and 25, 2016

for $9,958.13 and $283.19, respectively.

156.    AMEX card number 3767 397217 71003, assigned to Chris DeMure,

received an AMEX Purchase Protection Benefit payment on October 21, 2016, for

$939.26.

157.    AMEX card number 3712 911134 41006, assigned to Tina DeMure,

received two AMEX Purchase Protection Benefit payments on October 18, 2016 for

$9,245.76 and $1,190.59 and one  on October 24, 2016 in the amount of $171.82.

158.    The total amount the DeMures received from AMEX for the parallel claim

from the UHAUL trailer incident in Louisville, KY was $31,598.41.

159. Between the USAA and AMEX parallel claims, the DeMures received an overall payment benefit of $183,339.73 for the items stolen from the UHAUL trailer.

*MISPLACED BAG IN WASILLA – March 12, 2017*

160. On April 26, 2017 at 5:27am GMT, the DeMures faxed a 10-page claim form to AMEX requesting Purchase Protection Benefit Reimbursement for several items they reported being in "a bag, which was misplaced and not recovered" on March 12, 2017. The DeMures are not known to have provided any additional information about the circumstances of this claimed loss to AMEX. **Ctdemure@gmail.com** was listed on the AMEX claim form. The total amount claimed for Chris DeMure's AMEX card number 3712 457001 11000 was $9,600. The misplaced items in the bag were jewelry purchased on December 23, 2016. In addition to the claim, the DeMures also faxed a copy of a document purported to be a Wasilla Police Department (WPD) police report for incident 17WA7642.

161. On April 26, 2017 at 5:29am GMT, the DeMures a 14-page claim form to AMEX requesting Purchase Protection Benefit Reimbursement for several items reported as being "located in a bag, which was misplaced and not recovered". **Ctdemure@gmail.com** was listed on the AMEX claim form. The total amount the DeMures claimed for Chris DeMure's AMEX card number 3723 272364 03009 was $5,285. They also faxed a copy of the document purported to be a WPD police report for incident 17WA7642 with this claim.

162. Part of the faxed documentation included jewelry orders sent to **ctdemure@gmail.com** from J.R. Dunn Jewelers, Tiffany & Co. and The RealReal.



163.    Records obtained by the FBI from Tiffany & Co. indicated one of the items purchased and that they reported missing in the above referenced claim, was returned by the DeMures on March 1, 2017, for a full refund.  That is, the Tiffany records show this item was returned for a full refund 11 days before the reported date of loss listed by the DeMures in their claim.

164.    Amanda Graham, WPD Records Custodian, advised that WPD has maintained the same police report/incident report format since 2006.  Graham analyzed a copy of the police report submitted to AMEX by the DeMures as a WPD report that was identified by report number 17WA7642, dated April 22, 2017.  Graham advised the report the DeMures provided was not produced by WPD.  More specifically, Graham stated she did not recognize the incident number format (17WA7642) as being used by WPD or any law enforcement in the State of Alaska and that its format did not match WPR reports.   Graham confirmed WPD did not issue a report "7642" in 2017, and also pointed out that "Jacobson, L.," who was listed on the report as receiving the complaint, was not an employee of WPD.  Graham denied ever knowing anyone by the name "Jacobson, L.".  Graham reviewed WPD records going back to January 1, 2015 and could not find any history between WPD and anyone with the last name DeMure.  Graham reviewed the logo on top of the report and confirmed the logo was associated with the City of Wasilla, but advised that all WPD documents display the logo of a police badge.  An image of the first page of the document submitted by the DeMures that purports to be



a WPD report is set forth below:



//

//

//

//

//

//



165. For comparison, a screenshot of a redacted authentic WPD police/incident report is included below:



166. AMEX card number 3723 272364 03009, assigned to Chris DeMure, received an AMEX Purchase Protection Benefit payment on May 5, 2017, in the amount of $5,191.

167. AMEX card number 3712 457001 11000, assigned to Chris DeMure, received an AMEX Purchase Protection Benefit payment on May 11, 2017, in the amount of $9,500.

APR 1 1 2018

168.     The DeMures received a total amount of $14,691 from AMEX for the incident, including items "located in a bag, which was misplaced and not recovered."

*WASILLA THEFT – April 30, 2017*

169.     On June 4, 2017 at 8:40pm GMT, the DeMures faxed a 21-page claim form to AMEX requesting Purchase Protection Benefit Reimbursement stating, "items were in luggage, which were taken from our parked SUV" on April 30, 2017. **Ctdemure@gmail.com** was listed on the AMEX claim form. The total amount claimed for Chris DeMure's AMEX card number 3712 457001 11000 was $6,805.81. In addition to the claim, the DeMures also faxed a copy of a document purported to be a WPD police report for incident 17WA8159.

170.     On June 4, 2017 at 8:43pm GMT, the DeMures faxed a 21-page claim form to AMEX requesting Purchase Protection Benefit Reimbursement stating, "items were in luggage, which were taken from our parked SUV." **Ctdemure@gmail.com** was listed on the AMEX claim form. The total amount claimed for Chris DeMure's AMEX card number 3723 272364 03009 was $4,873.81. In addition to the claim, the DeMures also faxed a copy of the document purported to be a WPD police report for incident 17WA8159.

171.     In these claims, the DeMures reported that a variety of items were stolen from their parked SUV while in Wasilla, AK, on April 30, 2017. At no point in the claim process did the DeMures report where in Wasilla they were located when the theft occurred. The items the DeMures claimed had been stolen included various men's/women's/children's clothing, electronics, and other items. The DeMures

APR 1 1 2018

submitted purchase receipts in support of these claims. As to most of the receipts submitted, all the purchased items on each receipt were claimed in their entirety. For instance, the DeMures provided a Nordstrom Rack receipt dated March 11, 2017, for the purchase of 32 items. The DeMures claimed all 32 items were stolen from their vehicle on April 30, 2017. In addition to the purchase price on the claimed receipts, the DeMures also included sales tax and shipping and handling into the loss value. The DeMures provided 14 additional receipts in support of their claims from which all listed items were reported stolen at the same time. The dates on the receipts the DeMures submitted ranged from February 3, 2017, to April 27, 2017.

172. One of the items the DeMures reported as being stolen in the April 30, 2017 incident, was an item that the DeMures described in their claim as a blue colored iPod Touch (6-generation) with serial number CCQSH06TGM18, purchased on March 28, 2017, at the Apple Store in the Anchorage Mall for $399. Records obtained from Apple, Inc. establish that the same blue iPod Touch (CCQSH06TGM18) was registered via iCloud on August 26, 2017, to **ctdemure@gmail.com**.

173. According to the DeMures' AMEX claim and records the FBI obtained from Best Buy, on February 3, 2017, the DeMures purchased an Apple iPad Air 2, Wifi 128-GB Space Gray/Black with serial number SDMPSW8HKG5W1 for $449.99 from the Best Buy store in Anchorage using an unknown AMEX card. Records obtained from Best Buy show that the same iPad Air 2 was returned for a full credit card refund on February 11, 2017, to the same Best Buy store. The DeMures submitted the original

purchase receipt to AMEX on June 4, 2017, but neglected to provide the return receipt showing they received a full refund.

174. The document that the DeMures submitted in support of their claims that purported to be a Wasilla Police Department (WPD) report was styled, formatted, and contained the name of the same fictitious WPD officer as the WPD report they submitted in support of their March 2017 claim discussed above. Amanda Graham, WPD Records Custodian, previously confirmed that the report was not produced by WPD. An image of the report that the DeMures submitted to AMEX in support of their purported April 30, 2017, loss appears below:





175.    According to AT&T geolocation records, cellular telephone numbers 910-587-8785 and 910-578-8537 are both subscribed to by Chris DeMure.  Cellular telephone number 910-587-8785 is known to be used by Chris DeMure.  Cellular telephone number 910-587-8537 is known to be used by Tina DeMure.  The records indicated that on April 30, 2017, neither device was located in Wasilla, Alaska.  This investigation has shown that when cellular telephone number 910-587-8537 (used by Tina DeMure) accesses WiFi to either make a call or send a SMS, the user (Tina DeMure), may be accessing the DeMures' home WiFi network.  The DeMures reside at 1210 Tomahawk Dr., JBER, AK.

| Date | Time (AKDT) | Cell # | Method | Approx. Location |
|------|-------------|--------|--------|------------------|
| 04/30/17 | 6:10am | 910-578-8785 | SMS | 5th & Richardson, JBER, AK |
| 04/30/17 | 8:47am | 910-578-8785 | Voice | Davis & 1st, JBER, AK |
| 04/30/17 | 8:47am | 910-578-8537 | Voice | WiFi (Unk) |
| 04/30/17 | 12:09pm | 910-578-8537 | Voice | WiFi (Unk) |
| 04/30/17 | 12:09pm | 910-578-8785 | Voice | Horseshoe Dr. & North Eagle River Loop Rd., Eagle River, AK |
| 04/30/17 | 12:57pm | 910-578-8537 | Voice | WiFi (Unk) |
| 04/30/17 | 12:57pm | 910-578-8785 | Voice | Southbound Glenn Hwy, near South Eagle River exit, Eagle River, AK |
| 04/30/17 | 5:03pm | 910-578-8537 | Voice | WiFi (Unk) |

| 04/30/17 | 6:21pm | 910-578-8537 | Voice | WiFi (Unk) |
|----------|--------|--------------|-------|------------|

176. AMEX card number 3712 457001 11000, assigned to Chris DeMure, received an AMEX Purchase Protection Benefit payment on August 9, 2017, for $5,962.81.

177. AMEX card number 3723 272364 03009, assigned to Chris DeMure, received an AMEX Purchase Protection Benefit payment on August 9, 2017 for $4,872.01.

178. The DeMures received a total amount of $10,834.82 from AMEX for their claim arising from the April 30, 2017, incident in Wasilla.

*PALMER BAG – July 9, 2017*

179. On July 11, 2017, Chris DeMure called the Palmer Police Department (PPD), in Palmer, Alaska, and spoke with Myra Lanthier, a PPD Dispatcher. Chris DeMure reported a red colored The North Face backpack was left in the Fred Meyer grocery store parking lot with several items inside, including an Apple iWatch and jewelry. During the initial recorded call with Lanthier, Chris DeMure referred to himself as being in the military, his rank, and other military activities on at least four different occasions. When asked by Lanthier to put a value to the total loss, Chris DeMure estimated it to be a couple thousand dollars. Chris DeMure told PPD Dispatcher Lanthier that his insurance company was USAA. For clarities sake, the DeMures, never filed this incident claim with USAA, only with AMEX.

180.    Later in the day, after leaving a message on Chris DeMure's phone, PPD Officer Virginia Calvert received a call back from Chris DeMure. That call was also recorded. Again, Chris DeMure referred to himself as being in the military, his rank, and other military activities. In both calls with Lanthier and Officer Calvert, Chris DeMure referred to the misplaced bag as a singular small backpack that contained "not a whole lot" and "nothing of huge value." Chris DeMure goes on to summarize the contents as being an iWatch, kids clothes, a men's jacket, a casual bracelet, and "a couple things like that."

181.    FBI interviewed Officer Virginia Calvert and provided her with a copy of the PPD report that the DeMures submitted to AMEX to support their insurance claim. A screenshot image of the police report the DeMures submitted to AMEX is set forth below:



182. Officer Calvert pointed out several issues with the above report that led her to conclude that the report submitted to AMEX was falsified: (1) Her name is Virginia Calvert, not Z. Calvert; (2) The phone number on the letterhead, 907-746-9407, is Officer Calvert's direct desk phone and would never be listed in the PPD letterhead; (3) The listed report number, 17-3725, is not actually a report number, but rather an incident or log number, which is a record of Chris DeMure contacting the PPD, and no report was actually written on this incident; (4) The report Chris DeMure submitted to AMEX did not contain a logo in the letterhead. Calvert stated that all PPD reports contained a PPD blue seal; (5) Calvert pointed out the address listed in the report, 423 S Valley Way, was slightly incorrect, as in the official PPD letterhead there is a period after "S"; and (6) Calvert was unaware of any PPD documents referred to as a "Statement of Property Loss." Officer Calvert confirmed she was not the author of the document provided to AMEX.

183. On August 24, 2017, at 6:05pm EDT, the DeMures faxed a 9-page claim form to AMEX requesting Purchase Protection Benefit reimbursement reported as "items were in a bag and accidentally left outside vehicle in parking lot of grocery store" in the Fred Meyer parking lot in Palmer, Alaska. **Ctdemure@gmail.com** was listed on the AMEX claim form. The total amount claimed for Chris DeMure's AMEX card number 3723 272364 03009 was $5,659.79. In addition to the claim, a copy of the aforementioned falsified PPD police report for incident "17-3725" was submitted.

184. On August 24, 2017, at 6:09pm EDT, the DeMures faxed a 10-page claim form to AMEX requesting Purchase Protection Benefit reimbursement reported as "items



were in a bag and accidentally left outside of vehicle in parking lot of grocery store" in the Fred Meyer parking lot in Palmer, Alaska. **Ctdemure@gmail.com** was listed on the AMEX claim form. The total amount claimed for Chris DeMure's AMEX card number 3712 457001 11000 was $5,650. In addition to the claim, a copy of the falsified PPD police report for incident "17-3725" was submitted.

185.    On August 24, 2017, at 6:16pm EDT, the DeMures faxed a 13-page claim form to AMEX requesting Purchase Protection Benefit reimbursement reported as "items were in a bag and accidentally left outside vehicle in parking lot of grocery store. Bag was <u>stolen</u> by another person." **Ctdemure@gmail.com** was listed on the AMEX claim form. The total amount claimed for Chris DeMure's AMEX card number 3767 397217 71003 was $1,110.22. In addition to the claim, a copy of the falsified PPD police report for incident "17-3725" was submitted.

186.    The DeMures claimed a multitude of items were inside the misplaced/stolen bag in Palmer on July 9, 2017. This claim included considerably more items than he reported to Lanthier and Officer Calvert on July 11, 2017. That is, although Chris DeMure had stated to the PPD personnel that the missing items were inside one bag or small backpack, the DeMures submitted claims to AMEX for the loss of items in three The North Face bags and one Vibe 325 Crossbody bag.

187.    As to most of the receipts the DeMures submitted for this incident, all items purchased on each receipt were claimed in their entirety as being lost in the July 9, 2017, incident. For instance, a receipt for 12 items purchased at the Arizona Biltmore hotel in Phoenix, Arizona, was submitted. The purchase was made on May 27, 2017, totaling

APR 1 1 2018

$473.22. The DeMures claimed to AMEX that all 12 items were misplaced/stolen on July 9, 2017. In addition to the purchase price on the claimed receipts, the DeMures also include sales tax and shipping and handling into the loss value. The claim also included a receipt from REI in Anchorage for six items purchased on July 8, 2017. The DeMures claimed all six items were misplaced/stolen on July 9, 2017. Those items were a jacket, two wallets, and three bags, totaling $483.85. In all, the DeMures' claims for this incident included five additional receipts from which all items were reported stolen at the same time. The dates on all submitted receipts ranged from April 30, 2017, to July 8, 2017.

188.    The DeMures' claims with AMEX totaled $12,903.86, for 38 separate items.

189.    According to AT&T geolocation records, cellular telephone numbers 910-587-8785 and 910-578-8537, which are both subscribed to by Chris DeMure. Cellular telephone number 910-587-8785 is known to be used by Chris DeMure. Cellular telephone number 910-587-8537 is known to be used by Tina DeMure. The records indicated that on July 9, 2017, neither of the DeMures' AT&T cellular phones were located in Palmer. This investigation has shown that when cellular telephone number 910-587-8537 (used by Tina DeMure) accesses WiFi to either make a call or send a SMS, the user (Tina DeMure), may be accessing the DeMures' home WiFi network. The DeMures reside at 1210 Tomahawk Dr., JBER, AK.

//

//



| Date | Time (AKDT) | Cell # | Method | Approx. Location |
|---|---|---|---|---|
| 07/09/17 | 7:55am | 910-578-8785 | SMS | 5th & Richardson, JBER, AK |
| 07/09/17 | 8:03am | 910-578-8785 | SMS | Northbound Glenn Hwy, near Arctic Valley exit JBER, AK |
| 07/09/17 | 8:04am | 910-578-8785 | SMS | Northbound Glenn Hwy, near Arctic Valley exit JBER, AK |
| 07/09/17 | 9:17am | 910-578-8537 | SMS | WiFi (Unk) |
| 07/09/17 | 11:31am | 910-578-8537 | SMS | WiFi (Unk) |
| 07/09/17 | 1:24 pm | 910-578-8785 | SMS | 5th & Richardson, JBER, AK |
| 07/09/17 | 1:34pm | 910-578-8537 | Voice | WiFi (Unk) |
| 07/09/17 | 1:35pm | 910-578-8537 | Voice | WiFi (Unk) |
| 07/09/17 | 7:20pm | 910-578-8537 | SMS | WiFi (Unk) |
| 07/09/17 | 8:32pm | 910-578-8537 | SMS | WiFi (Unk) |
| 07/09/17 | 8:38pm | 910-578-8537 | Voice | WiFi (Unk) |
| 07/09/17 | 8:38pm | 910-578-8785 | Voice | Davis Hwy & 1st, JBER, AK |

190. In the fall of 2017, AMEX notified the FBI of possible fraudulent activity by the DeMures. Over the course of the following months, the FBI maintained contact with Peter Grimm, Global Security Investigations, Southern & Western United States with AMEX. To provide the FBI with additional time to investigation, the FBI asked AMEX make small gradual payment on the DeMures'claims for the July 9, 2017, Palmer misplaced/stolen bag incident. Accordingly, AMEX credited the DeMures credit cards as follows: (1) on December 18, 2017, AMEX reimbursed Chris DeMure's card number 3767 397217 71003 for $1,110.22 to claim #10321996; (2) on February 6, 2018, Grimm and AMEX authorized a payment for reimbursement to Chris DeMure's card number 3723 272364 03009 for $5,659.79 to claim #10321865; and (3) on February 6, 2018,



Grimm and AMEX authorized an additional payment for reimbursement to Chris

DeMure's card number 3712 457001 11000 for $5,650 to claim #10321859.

191.    At least two of the online order receipts the DeMures submitted for

reimbursement on the claims related to the July 9, 2017 incident included

**ctdemure@gmail.com**.  Additionally, all of the AMEX claim fax coversheets included

**ctdemure@gmail.com**.

### *STOLEN BAG IN LOS ANGELES – July 28, 2017*

192.    In mid-July 2017, the DeMures took a vacation to Fiji.  On the return trip,

they stopped in Los Angeles, California.  The DeMures reported that during the layover

in Los Angeles on July 28, 2017, one of their bags was either stolen or fell out of the

bottom of their stroller.

193.    On July 30, 2017, Los Angeles Police Department (LAPD) Officer Moreno

(officer #42323) received a telephone call from Chris DeMure reporting lost property.

Chris DeMure told Officer Moreno that he "lost his black bag with miscellaneous items

in the area of Hollywood and Vine on 7/28/2017 between the hours of 1100-1700 hrs."

Chris DeMure later provided Officer Moreno with an itemized list of stolen property,

which included one black bag, two Rolex watches, and two pearl strand necklaces, with a

value totaling approximately $87,570.

194.    On July 31, 2017, the DeMures received a USAA claim confirmation email

regarding the above referenced loss/theft to **ctdemure@gmail.com**, as well as to Tina

DeMure's email address at tinademure@yahoo.com.

195. On July 31, 2017, Chris DeMure wrote a message to USAA Claims Representative Dominika Kaszuba via the USAA system stating in part, "I wanted to include the paperwork that I have for the two pearl strands. I also included the receipt from REI for the black bag; it is only about $70." The black bag Chris DeMure referred to was the Vibe 325 Crossbody bag purchased from REI in Anchorage, AK on July 8, 2017. This same bag was claimed misplaced/stolen in Palmer, AK, on July 9, 2017. The receipt the DeMures submitted to AMEX in the Palmer incident included the transaction number 8190; the supporting documentation the DeMures provided to USAA for the L.A. loss/theft incident, included a REI purchase summary with the same transaction number 8190 (although on the summary, it was referred to as a purchase number).

196. In the conversation with USAA Claims Representative Kaszuba on the USAA system about the pearls, Chris DeMure wrote: "I actually used two different AMEX cards for this purchase - $10,712.84 and $4,591.65 – and included the snapshots from my AMEX account to show the purchase. Overall, this strand was $15,304.49." Chris DeMure followed up his message to Kaszuba with, "it means a lot as I get ready to head to Afghanistan in a couple weeks."

197. On August 3, 2017, USAA referred the DeMures' claim to SIU; however, the following day, SIU declined further involvement into the claim.

198. On August 16, 2017, USAA Claims Representative Kaszuba wrote in reference to the two Rolex watches:

"Our claim replacement services are able to order both watches for you, they just need to know if that is the way you would like to go. They advised 4-6 weeks for delivery and need to confirm the dial color for 40 mm watch, was it a basic dial?

Both the orders are special non-returnable order, but if you decide to cash out on the watches the settlement would be as follows: $33,756.00 for 31mm diamond dial Oyster, and $26,369.00 for 40mm Oyster Perpetual Day-Date."

199.   The following day, Chris DeMure replied:

"Hi Dominika…we are in a series of VTCs before we head to Afghanistan in a couple weeks. I spoke to my wife, Tina, and she asked if we could hold off on getting the watches now and receive the funds instead.  With me departing later this month to Afghanistan for nearly a year, we did not want to have watches laying around while I am gone and she heads back and forth to Chicago.  Also, we just found out that we are moving to Europe once I get back.  We planned to head to the Rolex headquarters     in     Switzerland     and     purchase     the     watches     then."

200.   The invoice the DeMures submitted for one of the Rolex watches from

Stein Diamonds listed Chris DeMure's military email address,

christopher.j.demure.mil@mail.mil.

201.   On August 23, 2017, an EFT payment for $79,609 was issued to the

DeMures, to be available within 1-2 business days.  **Ctdemure@gmail.com** received an

email confirmation regarding the EFT payment.

202.   On August 25, 2017, Chris DeMure wrote a personal check (#1364) drawn

on the DeMures' joint USAA checking account (#118750186) to Community Bank, N.A.

for $36,855.91.  This payment was applied to a vehicle loan held through Community

Bank, N.A. The vehicle this payment was applied to was a black-colored 2016 Chevrolet

Suburban, VIN #1GNSKJKC7GR100285, purchased by the DeMures on July 18, 2016,

from R.M. Burritt Motors, Inc. in Oswego, NY, for $69,322.  The check for $36,855.91

cleared Community Bank, N.A. on August 29, 2017, and payed off the remainder of the

vehicle loan.

APR 1 1 2018

203. TransUnion, a credit reporting company, advised that an automobile loan held through Bank of America (loan #63010040697690) for a 2016 Audi A7 was opened in April 2016 with a high credit value of $56,000, and closed in August 2017. USAA, indicated that an Automated Clearing House (ACH) debit charge of $32,391.99 was made by the DeMures online to Bank of America on August 28, 2017. On August 29, 2017, Bank of America issued an overpayment check for account #63010040697690 for $15.70 to Christopher J. DeMure, 1210 Tomahawk Dr., JBER, AK 99505.

204. In summary, on August 23, 2017, the DeMures received the $79,600 insurance payout from the Los Angeles incident to their USAA joint checking account (ending in 0186). Two-days later, on August 25, 2017, the DeMures made the final payment on their 2016 Chevrolet Suburban automobile loan. Five-days after receiving the insurance payout from USAA, on August 28, 2017, the DeMures made what appears to be the final payment on their 2016 Audi A7 loan to Bank of America. (The DeMures receipt of a $15.70 overpayment check suggests that their Bank of America automobile loan was paid in full.)

205. In addition to the USAA claim, the DeMures filed four (4) parallel claims with AMEX for their bag that was purportedly misplaced/stolen in Los Angeles on July 28, 2017.

206. On September 6, 2017 at 9:15pm EDT, Tina DeMure faxed a 7-page claim form to AMEX requesting Purchase Protection Benefit reimbursement for one Rolex watch purchased on May 26, 2017 from Robert Wesley Jewelers for $30,700. The DeMures reported this Rolex, as well as other items, were lost/stolen from a stroller in

Los Angeles. **Ctdemure@gmail.com** was listed on the fax coversheet and on the AMEX claim form, claim #10331912. The total amount claimed on Tina DeMure's AMEX card number 3712 457001 11018 was $30,700.

207. On September 6, 2017, at 9:15pm EDT, Chris DeMure faxed an 11-page claim form to AMEX requesting Purchase Protection Benefit reimbursement for one black pearl necklace and a split portion equating to about two-thirds the value of a light colored pearl necklace purchased in Fiji. The DeMures reported these pearl necklaces, as well as other items, were lost/stolen from a stroller in Los Angeles, CA. **Ctdemure@gmail.com** was listed on the fax coversheet and on the AMEX claim form, claim #10331908. The total amount claimed on Chris DeMure's AMEX card 3723 272364 03009 was $15,197.50.

208. On September 6, 2017, at 9:21pm EDT, Chris DeMure faxed a 9-page claim form to AMEX requesting Purchase Protection Benefit reimbursement for one Rolex watch purchased on May 18, 2017 from Stein Diamonds in the amount of $37,000. The DeMures reported this Rolex, as well as other items, were lost/stolen from a stroller in Los Angeles., CA. **Ctdemure@gmail.com** was listed on the fax coversheet and on the AMEX claim form, claim #10331906. The total amount claimed on Chris DeMure's AMEX card number 3712 457001 11000 was $37,000.

209. On September 6, 2017, at 9:29pm EDT, Chris DeMure faxed a 10-page claim form to AMEX requesting Purchase Protection Benefit reimbursement for split portion equating to about one-third the value of a light colored pearl necklace purchased in Fiji. The DeMures reported this pearl necklace, as well as other items, were lost/stolen

APR 11 2018

from a stroller in Los Angeles. **Ctdemure@gmail.com** was listed on the fax coversheet and on the AMEX claim form, claim #10331910. The total amount claimed on Chris DeMure's AMEX card 3767 397217 71003 was $4,591.65.

210.    Chris DeMure included a letter in the fax to AMEX under claim #10331908 and #10331910, in which he explained the split purchase of the light colored pearl necklace. The effect of Chris DeMure structuring the purchase in that way was to maximize the claim payout benefit, as the limit per incident is $10,000.

211.    According to AT&T geolocation records, both of the cellular telephone devices described above, which were subscribed by Chris DeMure and used by Chris and Tina DeMure, were located in Los Angeles, CA, on July 28, 2017.

212.    Over the course of January and February 2018, your affiant was in regular contact with Grimm from AMEX. Grimm directed Shelley White, Sr. Fraud Analyst SIU from AMEX, to exclusively communicate with Chris DeMure via email. White's email signature line notes that she is a fraud analyst. On February 5, 2018, Chris DeMure sent the following email to White from his military email account (christopher.j.demure.mil@mail.mil): "I sense that something is wrong, or that [*sic*] might be confusion. Please let me know if I can assist, or if the claims should be cancelled." The two outstanding claims (#10321859 and #10321865), from the Palmer, AK misplaced/stolen bag incident, were reimbursed the following day at your affiant's request.

213.    On February 12, 2018, Chris DeMure emailed AMEX fraud analyst White from christopher.j.demure.mil@mail.mil: "I sense that something is wrong, or there



might be confusion. Please let me know if I can assist, or if the claims should just be cancelled. As mentioned, I have been out of the loop since the summer and believe the following claims are still active." Chris DeMure then listed the four outstanding claims from the misplaced/stolen bag in Los Angeles.

214. On February 20, 2018, at the direction of your affiant, Grimm forwarded the following email verbiage to White for her to forward onto Chris DeMure:

> "Dear Mr. Christopher DeMure, thank you for your inquiries regarding the below insurance claims. Due to the relatively high volume of claims made by you we are requesting that you submit the following two items to us: a personal statement regarding the circumstances surrounding your losses for the below claims; a legible copy of the police report you filed. We are hoping to resolve your claims as soon as possible and would appreciate a prompt response. If you happen to have located the missing items and/or you would like to cancel these claims with us please respond to this email stating so." (The following claim numbers were listed at the bottom of the email: #10331906, #10331908, #10331910, and #10331912.)

215. Later on February 20, 2018, Chris DeMure sent the following reply from christopher.j.demure.mil@mail.mil:

> "As mentioned, I have been in Afghanistan since this summer- shortly after these were filed. Although I do not have the details of these claims, I believe these items were located/replaced after digging into this with my wife. As such, please go ahead and cancel all four claims. Thank you for your time. LTC Chris DeMure, Commander, Task Force 3 GERONIMO, Bagram Airfield, Afghanistan."

### REQUEST/JUSTIFICATION FOR ORDER OF NONDISCLOSURE

216. The United States respectfully applies for an order of nondisclosure to Google, Inc. under 18 U.S.C. § 2705(b) regarding this warrant as to the following account: **ctdemure@gmail.com**. The United States is seeking this search warrant for email content, and well as subscriber information, including all names, addresses, IP addresses, including historical, telephone numbers, other email addresses, information on

APR 1 1 2018

length and types of services and any means of payment related to these accounts pursuant to 18 U.S.C. § 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A). Based on § 2703(b)(1)(A), Google is not required to provide notice to the subscriber. The United States is not required to provide notice to the subscriber. Based on § 2703(c)(3), the United States is not required to provide notice to the subscriber. Under § 2705(b), the United States may apply to the court for an order commanding Google not to notify the subscriber of the existence of the search warrant. The court may decide what length of time shall apply to the order of nondisclosure if the court determines the notification to the subscriber could result in one of the five factors listed in the statute, which includes destruction of or tampering with evidence. 18 U.S.C. § 2705(b)(3). The basis for the request is that such disclosure could cause any person with access to the accounts, or any related account or account information, to tamper with or modify the content or account information and thereby destroy or tamper with evidence and otherwise seriously jeopardize the investigation. Especially due to the ease of access to Google, Inc., persons can modify its content with internet access and sufficient account information. As such, the United States respectfully requests this Court enter an order commanding Google, Inc. not to notify the user of the existence of this warrant.

## REQUEST FOR SEALING OF MATTER

209.     I request that the Court order sealing this case until further order of the Court. The documents filed in the case discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets



an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

## LIMIT ON SCOPE OF SEARCH

210.    I submit that if during the search, agents find evidence of crimes not set forth in this affidavit, another agent or I will seek a separate warrant.

## CONCLUSION

211.    As noted above, this affidavit is made in support of an application for a warrant to search **ctdemure@gmail.com**, more particularly described in Attachment A, to seize the items set forth in Attachment B. As detailed herein, I respectfully submit that there is probable cause to believe that the DeMures, users of **ctdemure@gmail.com** constitutes an instrumentality and contains evidence of the SUBJECT OFFENSES.

212.    Law Enforcement agents will serve the requested warrant on Google, which will then compile the requested records at a time convenient to it, so there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

213.    For these reasons, I request authority to seize all electronic communications and other content stored in **ctdemure@gmail.com**, as detailed in Attachment A and Attachment B, to be searched off-site in a controlled environment. Law enforcement officers and agents will review the records sought by the search warrant and will segregate any messages and content constituting evidence, fruits or instrumentalities of violations of federal criminal law. Additionally, I request authority to serve the warrant

APR 1 1 2018

on Google via the internet and to allow Google to copy the data outside of this agent's presence.

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

Signed: **Signature Redacted**

Tyler Vose, Special Agent

Date: _04/11/18_

Subscribed and sworn to before me this _11_ day of April, 2018.

/S/ DEBORAH M. SMITH
CHIEF U.S. MAGISTRATE JUDGE
SIGNATURE REDACTED

DEBORAH M. SMITH
CHIEF U.S. MAGISTRATE JUDGE